ANNIE MERCIER, administratrix, *vs.* UNION STREET RAILWAY COMPANY.

Bristol.     February 6, 7, 1918. — May 27, 1918.

Present: RUGG, C. J., DE COURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Negligence,* Contributory, Street railway, Causing death. *Street Railway. Witness,* Cross-examination.     *Evidence,* Relevancy.     *Practice, Civil,* Opening statement of counsel.

In an action by an administrator against a street-railway corporation under St. 1906, c. 463, Part I, § 63, as amended by St. 1907, c. 392, for causing the death of the plaintiff's intestate after he had alighted from a car of the defendant by his being struck and instantly killed by another car of the defendant coming on a parallel track from the opposite direction, there was evidence that the stopping place where the plaintiff's intestate alighted was in a sparsely settled neighborhood in the country where there was a plank crossing of the defendant's tracks that led to a lane on which there were some camps, one of which was the intestate's, that the night was a dark one, that the double tracks of the defendant were at the side of the highway with swamps and wooded land beyond them and were more than seven feet from the wrought part of the highway, that three other passengers got off when the intestate did, that when the car stopped for them to alight the conductor called out, "Watch the car in back," or words to that effect, and that there were several cars following on the same track. The three other passengers that got off when the intestate did testified that the intestate when he left the car looked back at the car following on the same track, which had its searchlight on, and then started to cross the parallel track when he was struck and killed by another car of the defendant, which came from the opposite direction without giving any signal and with no lights visible or with a single headlight; that the intestate either was looking in the direction opposite from the car that struck him or was looking straight ahead, that two of the three other passengers saw his peril and shouted to warn him but that he appeared not

to hear them and walked on until he was struck. *Held,* that, although, if the accident had happened before the passage of St. 1914, c. 553, so that the burden would have been on the plaintiff to show due care on the part of the intestate, there would have been no evidence to go to the jury on this issue, yet, with the presumption of the intestate's due care created by the statute and the burden placed on the defendant to prove contributory negligence, it could not be ruled as matter of law that the negligence of the intestate contributed to his death, and the question of his negligence was for the jury.

In the case above described it was *said* that it was not necessary in that case to determine whether St. 1914, c. 553, § 2, made any change in the degree of care on the part of the person killed which is required by the statutes imposing penalties for causing death, it being expressly made applicable to those statutes by § 1, in which it is provided that "the person . . . killed shall be presumed to have been in the exercise of due care."

If on a dark night a motorman is operating an electric street railway car on a country road where the double tracks of the street railway are laid at the side of the road next to swampy and woody land, and is approaching a crossing leading to some camps where cars often stop and where he knows that passengers alighting from a car coming from the opposite direction on the other track must get out at the extreme side of the road and must cross the track on which he is running his car in order to get to the wrought part of the highway, and where a car has in fact stopped to discharge passengers only a moment before, and if the motorman is so blinded by the lights of motor cars on the highway that he cannot see clearly, it cannot be ruled as a matter of law that it is not negligent for him to proceed under these circumstances to run over the crossing leading to camps at the rate of twenty miles an hour after shutting off his headlight.

In the case above described it also was *held* that it was no evidence of negligence on the part of the conductor of the car from which the plaintiff's intestate had alighted that his warning to the passengers was confined to the car following and did not refer to the car coming on the other track, he having given no assurance of safety from that source of danger.

In the same case it was *pointed out* that the intestate had ceased to be a passenger of the defendant when he had alighted from the car.

In the case above described the defendant called as a witness one of the passengers on the car that struck the intestate, who on his direct examination testified "that the car was going at about the regular speed that it usually runs; that he could not tell just how many miles an hour it was going." On his cross-examination by the plaintiff he testified that the car "was going at what seemed to him about the usual speed." He then was asked by the plaintiff, "Don't you know that the usual speed there is forty miles an hour?" The presiding judge excluded the question, subject to the plaintiff's exception. *Held,* that the exclusion of the question was within the discretion of the presiding judge, which appeared to have been exercised wisely.

In the case above described there was evidence that when the accident occurred the car from which the plaintiff's intestate had alighted had started again and there was no evidence that that car was stationary at the time it was passed by the car that struck the intestate. Subject to the plaintiff's exception, the judge excluded evidence of a rule of the defendant governing the conduct of motormen "passing standing cars." *Held,* that the exclusion was proper, the rule being inadmissible upon the facts shown.

In the case above described the presiding judge, who ordered a verdict for the defendant, as a matter of right at the request of the plaintiff and against the objection of the defendant allowed the insertion in the plaintiff's bill of exceptions of a statement of the opening to the jury by the defendant's counsel.   There was nothing in the opening to indicate that it was intended as an admission or that it differed in any essential particular from the evidence afterwards introduced by the defendant.   *Held,* that the opening of the defendant's counsel was not a part of the record and that a statement of it ought not to have been included in the bill of exceptions.

TORT by the administratrix of the estate of Joseph Mercier under St. 1906, c. 463, Part I, § 63, as amended by St. 1907, c. 392, for causing the instant death of the plaintiff's intestate at about a quarter past eleven o'clock on Saturday night May 20, 1916, at Howland's Crossing in Westport when the intestate had alighted from an electric street railway car of the defendant on which he had been a passenger and was crossing the parallel track of the defendant, where he was struck by another car of the defendant coming from the opposite direction.   Writ dated June 14, 1916.

In the Superior Court the case was tried before *Morton* J.   The evidence is described in the opinion.   At the close of the evidence, on a motion filed by the defendant, the judge ordered a verdict for the defendant; and the plaintiff alleged exceptions.   At the request of the plaintiff, against the objection and subject to the exception of the defendant, the judge allowed, as a matter of right and not of discretion, the insertion in the bill of exceptions of a statement of the defendant's counsel's opening to the jury.

In the course of the trial one Robinson, called as a witness by the defendant, testified that he was a passenger on the car that struck the plaintiff's intestate and "that the car was going at about the regular speed that it usually runs; that he could not tell just how many miles an hour it was going."   On cross-examination he testified "that it was going at what seemed to him about the usual speed."   He then was asked, "Don't you know that the usual speed there is forty miles an hour?"   The judge excluded the question and the plaintiff excepted.

St. 1914, c. 553, is as follows:

"Section 1.   In all actions, civil or criminal, to recover damages for injuries to the person or property or for causing the death of a person, the person injured or killed shall be presumed to have

been in the exercise of due care, and contributory negligence on his or her part shall be an affirmative defence to be set up in the answer of, and proved by the defendant.

"Section 2. All acts and parts of acts inconsistent herewith are hereby repealed.

"Section 3. This act shall take effect upon its passage, but shall apply only to actions or causes of action hereafter accruing.

"Approved May 21, 1914."

*C. R. Cummings,* for the plaintiff.

*D. E. Hall & C. A. Wilson,* for the defendant.

RUGG, C. J. The plaintiff's intestate alighted from a car between eleven and twelve o'clock on a dark night in a sparsely settled neighborhood in the country where the double tracks of the defendant were upon the southerly side of the highway and more than seven feet from its wrought part. He had come as a passenger from Fall River, and the car upon which he had travelled was on its way to New Bedford. The place of the accident was at a crossing leading from the highway to a lane where were some camps. The crossing consisted of planks against the rails. For a mile both to the east and to the west were no intersecting roads, and the land on one side of the tracks was swampy and wooded. Three other passengers got off at the same place, and the car started on its way. The tracks for at least a mile on each side ran in a straight line and the grade was nearly level one way and ascending the other. The direction of the tracks was approximately east and west. The car was an open one, but the curtains in front and on its left or north side were all down, so that a passenger could not readily see out on those two sides. There was plenty of testimony tending to show that when the car stopped the conductor called out "Watch the car in back," or words to that effect, and that there were several cars following on the same track. The narratives of the three passengers who left the car at the crossing, respecting the actions of the deceased and the circumstances which attended him, were in substance these:

One Tolley testified that the deceased, when he left the car and was on the ground, looked back at the car following on the same track, which had its searchlight on, and the car they had left started up; after that the deceased started to cross the track, but before he could get across, the car from New Bedford struck him.

Up to that time there had been no signal given from that car; "the witness did not see any lights on it burning, and that he was looking, and that up to that time he had not seen that car coming from New Bedford. . . . When he turned round and looked at this car, he did not see any lights on it." The witness was going to a camp in the opposite direction from the course pursued by the deceased. He testified on cross examination that he did not notice any light on the car approaching. "He wasn't paying any attention as to whether any car was coming from New Bedford after he alighted. . . . He didn't mean to say that the ordinary headlight and the ordinary lantern were not on the front end of the car that came in contact with" the deceased. "When he turned round and looked at it [the car from New Bedford], the front part had passed him and he couldn't see any lights and that he didn't see the front part of it at all; that, if there was a searchlight on the car, he couldn't see it; that he wouldn't say and did not mean to say that there wasn't a lantern and an ordinary headlight on the front end of the car; that he did not know."

One Gagnon testified that the deceased "got off the car, turning to his right, walking to the rear of the car and crossing the crossing on the other side, and looked toward Fall River; and proceeded on, walking across the track, and then he was caught by the car coming from New Bedford;" that the car gave no signal; that the car from which they alighted passed the crossing, and that the rear platform was "hanging over the crossing;" that he saw the car from New Bedford because he "put his head out on the north side of the car" before he alighted and "saw the other car coming from New Bedford and at that time the other car had its searchlight going." He knew where the deceased lived and anticipated that he "would go out on the street and walk up toward his camp;" that after starting up the lane, he thought of the car from New Bedford and turned around and "tried to holler at him, but it was too late;" that he saw the deceased as he started to turn and look toward Fall River, but did not see him again until he was on the track where he was struck.

One Howland testified that he was sitting on the front seat of the car, that after stepping off the car he glanced down the track toward New Bedford and saw the car coming and saw its headlight; that he saw the deceased getting off the car and he "pro-

ceeded to go around the rear of the car;" that "at first, the witness did not think that Mr. Mercier [the deceased] was going to cross, and when he saw that Mr. Mercier was going round the rear, the witness shouted at him not to cross for there was a car coming; that Mr. Mercier didn't show any signs of hearing . . .; that the witness started to see if he could get near enough to Mr. Mercier to warn him; that when the witness hollered, the car on which the witness had been riding was starting up and was making noise; that when Mr. Mercier started round the car, the witness started to follow him, and when the witness was in the middle of the south-bound track, Mr. Mercier was in the middle of the northbound track, and the car hit him; . . . that he didn't notice whether there were any other lights on the front" of the car from New Bedford "besides the big headlight, that blinded him (witness) so that he could not see;" that the witness, having seen that car coming from New Bedford and the car from which they had alighted having started, saw Mercier go round back of the car from which they got off; that the witness saw that Mercier was in danger and witness shouted to him as loud as he could, but Mercier kept right on; that the witness ran; "that he could see Mr. Mercier as he walked across; that Mercier was walking with his head straight ahead; that the witness didn't notice that Mr. Mercier looked to the right or to the left; that so far as witness saw, Mr. Mercier walked straight ahead with his face straight ahead, walking at an ordinary gait, not hurrying. . . . It was dark and I could not discern whether he looked one way or the other; . . . that the witness shouted as loud as he could . . . and that Mr. Mercier did not stop."

The motorman of the car which struck the deceased testified that the first thing that directed his attention to the accident was the breaking of glass near the crossing; that at that time his car was going about twenty miles an hour; that about two hundred feet before he reached the crossing he blew his whistle; that nothing interfered with his vision except headlights on automobiles in the highway, which blinded him so that he could not see, and he thereupon threw off his arc light in accordance with one of the rules of the defendant; that he saw the car from Fall River going toward New Bedford about three hundred feet from the scene of the accident, and that he did not see the intestate before striking him.

When asked whether he could see the crossing, he replied, "I could see part way over on the inner rail, but I couldn't see clear on to the other side. I could see the crossing in front of me in the distance and a little way beyond the crossing;" that the witness did not notice the other car stop; that he was watching the automobiles coming on the road; that it was his duty to look out for other cars that are coming, and to watch when they stop to let off passengers; that the lights from the automobiles struck his window when he was about two hundred feet from the place of the accident and blinded him so that he could not see anything; that he could not tell whether men got off the car or not, but knew that passengers might have gotten off.

There was other evidence much more favorable to the defendant, but that is now immaterial because in this inquiry the evidence must be considered in its aspect most favorable to the plaintiff.

Before the enactment of St. 1914, c. 553, there would have been no case for the jury. The evidence would not have been sufficient to support a finding that the burden of proof resting upon the plaintiff to show that her intestate was actively and actually in the exercise of due care had been sustained. *Kennedy* v. *Worcester Consolidated Street Railway,* 210 Mass. 132. *O'Brien* v. *Boston Elevated Railway,* 217 Mass. 130. *Adams* v. *Boston Elevated Railway,* 219 Mass. 515. *Hayes* v. *Boston Elevated Railway,* 224 Mass. 303. *Cohen* v. *Boston Elevated Railway,* 202 Mass. 66. But important changes have been wrought by that statute. The burden of proving contributory negligence is now placed on the defendant and the person injured is presumed to have been in the exercise of due care. All the facts surrounding this injury are not in evidence. The conduct of the deceased is not fully disclosed by the evidence. There are crucial points upon which it is silent.

The record is bare of testimony as to the appearance of the car from New Bedford as one might have seen it from the position of the deceased just before he stepped into a place of danger. Whether the searchlight was turned off before he reached a point where he could have seen it, whether there were other lights on its forward end after the searchlight was turned off, whether the car was lighted inside and, if so, whether these lights by reason of the structure of the car or otherwise were such as to be visible to one nearly in

front on such a dark night, were questions about which there was no evidence and about which a specific finding was not required. Whether, also, the lights from nearby automobiles may have blinded the deceased, or otherwise confused him respecting the on coming car are matters as to which there was no direct evidence. Whether he heard the warning shouts of Howland and Tolley is a subject touching which there is no evidence. Whether he looked in the direction of the car from New Bedford, and if he did, what he might have seen, are matters somewhat conjectural even in view of Howland's testimony. Although the evidence, with all its inferences, points strongly toward want of care on the part of the deceased, it is not of such nature that a ruling can be made that the defendant as matter of law has sustained the burden of showing that the negligence of the deceased was a cause contributing to his death.

Although under some circumstances the evidence may be such as to require a ruling as matter of law that the burden of proof resting on a party has been sustained, where the evidence consists of conflicting oral testimony, or where on all the facts, more than one inference rationally may be drawn, it is a question of fact and cannot be ruled as matter of law. *Duggan* v. *Bay State Street Railway, ante,* 370, where the meaning and effect of St. 1914, c. 553, is discussed at large. The case at bar falls within the general rule and is not an exception to it. See *Grant* v. *Boston Elevated Railway,* 229 Mass. 219. If reference be had to Federal cases where the presumption and burden of proof are like those established by the statute, the case at bar resembles *Baltimore & Potomac Railroad* v. *Landrigan,* 191 U. S. 461, rather than *Northern Pacific Railroad* v. *Freeman,* 174 U. S. 379.

It is not necessary to determine whether St. 1914, c. 553, § 2, has made any change in the degree of care required in cases arising under the penalty death statutes. If it be assumed that the rule of *Hudson* v. *Lynn & Boston Railroad,* 185 Mass. 510, remains unaffected, the presumption as to due care raised by the first section of the statute is co-extensive with the requirements of that rule, for it expressly is made applicable to actions or indictments for the recovery of damages for causing death.

The question of the negligence of the motorman of the car which struck the intestate was a fact to be decided on all the evi-

dence. It might be found that he ought to have known, or at least ought to have acted on the theory, that passengers may have left the car from Fall River, and that therefore he ought to have sounded his whistle as he approached the crossing, or diminished the speed of his car, or otherwise made sure that one about to cross was warned in some way on such a dark night of the approach of his car. Whether he ought to have inferred from all the facts known to him that the car from Fall River had stopped at this crossing and had discharged passengers, who would be likely to cross to the main part of the highway, were matters to be settled by the application of sound judgment and could not have been ruled as matters of law.

Each case of this kind depends in large part upon its peculiar facts. The case at bar is not an instance of people getting or being upon the tracks at an hour or place where no rational expectation ought to anticipate such a thing, like *Kupiec* v. *Warren, Brookfield & Spencer Street Railway,* 196 Mass. 463, *Johnson* v. *Guffey Petroleum Co.* 197 Mass. 302, and *Singer Sewing Machine Co.* v. *Springfield Street Railway,* 216 Mass. 138, and it is not the sudden incursion of pedestrians in front of a car at a place where no one could reasonably foresee such an event, like *Donahue* v. *Massachusetts Northeastern Street Railway,* 222 Mass. 233, and *O'Donnell* v. *Bay State Street Railway,* 226 Mass. 418. The car which struck the deceased was approaching a place where cars frequently stopped to leave passengers, where one had in fact stopped a moment before; where passengers in the exercise of due care must get off the car at the extreme side of the highway and in order to reach the wrought path must pass over the tracks. It hardly could have been ruled as matter of law under these circumstances that it was not negligent for a motorman, so blinded by the lights of automobiles nearby that he could not see clearly, to proceed at the rate of twenty miles per hour after shutting off his headlight. There was no evidence of negligence on the part of the conductor of the car on which the deceased was a passenger. His warning, even if confined to the car following and not directed to the one coming on the other track, was no assurance of safety in that particular, and no evidence of negligence. *Blackwell* v. *Old Colony Street Railway,* 193 Mass. 222.

The intestate ceased to be a passenger of the defendant when he had alighted from the car, and he was no longer entitled to the protection of a passenger. *Creamer* v. *West End Street Railway,* 156 Mass. 320. *Thompson* v. *Gardner, Westminster & Fitchburg Street Railway,* 193 Mass. 133. *Niles* v. *Boston Elevated Railway,* 225 Mass. 570.

The exclusion of the question to the witness Robinson, as to the speed of the cars being forty miles per hour, was within the discretion of the presiding judge, which appears to have been exercised wisely.

The rule of the defendant governing the conduct of motormen operating cars "passing standing cars" was inadmissible upon the other facts shown. There was no evidence that the car from which the deceased had alighted was stationary at the time it was passed by the car in control of the motorman whose negligence is alleged to have caused the fatal injury.

The opening of the defendant's counsel ought not to have been included in the bill of exceptions. It is not permissible as matter of right in the ordinary case. Of course, when admissions are made in the opening or otherwise in the course of a trial, they have binding force. *McMahon* v. *Lynn & Boston Railroad,* 191 Mass. 295, 299. But that does not mean that openings of counsel become parts of the record of a trial. Openings commonly are not made for the purpose of expressing admissions, and, as the trial progresses, there may be changes in the contentions of counsel. *Commonwealth* v. *Retkovitz,* 222 Mass. 245, 252. There is nothing in the opening as printed to indicate that it was intended as an admission or that it differed in any essential particular from the evidence introduced by the defendant.

*Exceptions sustained.*